UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID AXELROD | : | CASE NO. |
| *Plaintiff*, | : | |
| v. | : | |
| | : | |
| POSIGEN CT, LLC  and | : | |
| THOMAS A. NEYHART, | : | |
| *Defendants*. | : | MARCH 24, 2022 |
| | : | |

COMPLAINT

INTRODUCTION

1.  Plaintiff David Axelrod was employed as a recruiter by defendants PosiGen CT, LLC ("PosiGen") and Thomas A. Neyhart, its manager and principal member. By misclassifying Mr. Axelrod as "exempt" while he worked 70-plus hours per week, defendants failed to pay him for thousands of hours of overtime, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and the Connecticut wage and hour laws, Conn. Gen. Stat. §§ 31-68, 31-76b and 31-76c. Defendants also failed to pay his bonuses or commissions, in violation of Conn. Gen. Stat. §§ 31-71a(3) and 31-72. Having overworked him without lawful compensation, defendants then terminated Mr. Axelrod publicly, in an unusually callous and cruel manner. They refused to explain his discharge to him but falsely told his co-workers that he was fired for stealing. They refused to return his personal property, even when Bridgeport police officers accompanied him to their office to request it. That property included an orthopedic brace approved by PosiGen for his upcoming knee surgery and an ergonomic chair he had purchased privately. In this lawsuit, Mr. Axelrod seeks unpaid overtime wages and commissions, liquidated and double damages under section 216(b) of the FLSA and sections 31-68 and 31-72 of the Connecticut General Statutes, compensatory and punitive damages, attorney's fees, and other lawful relief.

1

JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. With respect to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is appropriate in the District of Connecticut under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred, and a substantial part of property that is the subject of the action is situated, within this judicial district.

PARTIES

4. Plaintiff David Axelrod resides at 174 Beach Avenue, Milford, CT 06460. Mr. Axelrod was an employee of defendants as that term is defined by the FLSA, 29 U.S.C. § 203(e)(1), and by Conn. Gen. Stat. §§ 31-58(e) and 31-71a(2).

5. While he worked for defendants, Mr. Axelrod was an employee engaged in commerce or the production of goods for commerce, and/or was an employee in an enterprise engaged in commerce or the production of goods for commerce within the meaning of 29 U.S.C. § 207(a)(1).

6. Defendant PosiGen CT, LLC ("PosiGen") is a domestic corporation doing business in Connecticut and formed under Connecticut law. It is in the business of solar electric power generation.

7. At all times relevant to this complaint, defendant PosiGen was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1), with offices in Connecticut including one at 304 Bishop Avenue in Bridgeport.

8. Upon information and belief, PosiGen's annual business volume exceeded $500,000.00 at all times relevant to this complaint.

9. At all times relevant to this complaint, defendant Thomas A. Neyhart has been PosiGen's manager and principal member. He lists his principal residence address with the Connecticut Secretary of State as 304 Bishop Avenue, Bridgeport, CT 06610.

10. During the time of Mr. Axelrod's employment with PosiGen, defendant Neyhart was responsible for the company's operations, hiring, firing, promotions, personnel matters, work schedules, pay policies, and compensation, and he was responsible for all relevant decisions regarding the setting of hours for and the payment of wages to Mr. Axelrod.

11. At all times relevant to this complaint, the defendants were each and all employers as that term is defined by the FLSA, 29 U.S.C. § 203(d), and by Conn. Gen. Stat. §§ 31-58(d) and 31-71a(1).

12. Mr. Axelrod began his employment with defendants on November 11, 2019. Defendants discharged Mr. Axelrod on February 1, 2022.

13. Mr. Axelrod's title was "Talent Acquisition Specialist/Recruiter-Northeast Region," and he was based in defendants' Bridgeport, Connecticut office.

14. Defendants paid Mr. Axelrod a base annual salary of $75,000. They set a "monthly recruiting goal" for him of five new hires per month, for which he would be paid a bonus or commission of $200 for each new hire who was retained for 90 days.

15. In their hire letter, defendants stated that Mr. Axelrod's "position is classified as exempt/salaried under the Fair Labor Standards Act provision." The hire letter did not state whether or not defendants were portraying the position as exempt under Connecticut law.

16. Mr. Axelrod's primary duties for defendants were to review the resumes of job candidates and conduct a limited pre-screen interview to see if the applicant was interested in the position and met the basic job qualifications. Mr. Axelrod would then forward the names and work histories of candidates to managers. Those managers would determine whether candidates were appropriate for job openings. For candidates deemed by a manager to be appropriate, Mr. Axelrod would schedule an interview to be conducted by that manager. Starting in about fall of 2020, Mr. Axelrod also conveyed job offers by phone to successful candidates.

17. Mr. Axelrod did not make hiring decisions for defendants and had no authority to do so.

18. In addition, when staff returned to the Connecticut office in June 2021 after working remotely during the COVID-19 pandemic, Mr. Axelrod helped attend to certain office operating arrangements, which included tasks like arranging for a carpet-cleaning service, ordering supplies upon the approval of management, and organizing the holiday party.

19. Mr. Axelrod did not customarily or regularly exercise discretion or independent judgment. He did not make decisions independently, but he instead followed procedures set by defendants.

20. The ordinary and regular duties of Mr. Axelrod's position were not those of a legitimately exempt employee.

21. Mr. Axelrod virtually always worked far more than 40 hours in a one-week period. During time periods when staff worked in the office, Mr. Axelrod generally worked there (without any break) for at least 10 hours on most days, then continued working at home after a break for dinner, and then working at home the following morning before leaving for the office again. During time periods when staff worked remotely because of COVID, Mr. Axelrod

regularly worked at least 12 hours per day at home. During all relevant time periods, Mr. Axelrod also worked significant hours during weekends. Mr. Axelrod averaged at least 70 work hours per week throughout his employment, and he exceeded 100 hours of work during a number of weeks.

22. Defendants did not create and maintain a complete and accurate record of the start and end times of Mr. Axelrod's daily employment. They did not maintain records of the number of hours he worked in a day or a week. They did not require him to record his start and end times or the number of hours he worked in a day or week.

23. In about the spring of 2021, Mr. Axelrod contacted the Connecticut Department of Labor to inquire about whether he had been misclassified as an exempt employee. DOL provided him with a link to an article on exempt classifications. Mr. Axelrod concluded from that article that he should be a non-exempt employee and should be eligible for overtime pay.

24. Mr. Axelrod then inquired twice with defendants about whether it was proper for the company to classify him as exempt. On the first occasion, he spoke to one of defendants' payroll and benefits specialists but was told that he was properly classified as exempt because he "hires people." Mr. Axelrod disagreed and explained that he was essentially just carrying out the company's hiring processes, but the employee reiterated that he was correctly classified as exempt and therefore not entitled to receive overtime pay.

25. Mr. Axelrod then brought this issue to one of the company's vice presidents, who also told him he was properly classified as exempt because he supposedly made "decisions" related to hiring.

26. Defendants failed and refused to pay Mr. Axelrod one and one-half times his regular hourly rate for hours worked in excess of 40 hours each week.

27.     Defendants unlawfully misclassified the plaintiff as an exempt employee.

28.     In December 2021, Mr. Axelrod's supervisor announced that she was leaving PosiGen.

29.     Mr. Axelrod said he would like to move into a more senior role, and his supervisor said, in words or substance, "Let's make that happen."

30.     Mr. Axelrod's supervisor asked him to put together a proposed job description for his new role. Mr. Axelrod did so and sent it to her, and she promised to review the issue with defendant Neyhart.

31.     Mr. Axelrod's supervisor then informed him that he was going to be promoted. She said defendant Neyhart would meet with him soon, but that defendant Neyhart would probably adjust his proposed job description. She helped to arrange a meeting between Mr. Axelrod and defendant Neyhart.

32.     Defendant Neyhart met with Mr. Axelrod on January 25, 2022 and informed him that he was being promoted to senior recruiter, with a pay raise. The meeting ended on good terms.

33.     Mr. Axelrod arranged for a follow-up meeting with defendant Neyhart to discuss his proposal for new contributions to the company. Mr. Neyhart's assistant suggested that he call his former supervisor, who had left the company, for suggestions about the best way to approach the meeting.

34.     A meeting between Mr. Axelrod and defendant Neyhart took place on January 26, 2022. Defendant Neyhart stated that he wanted to invest in Mr. Axelrod's development, and he increased the salary that Mr. Axelrod would be paid in his new role as senior recruiter.

35. On or about January 28, 2022, Mr. Axelrod called Brandy Mulherin, defendants' Director of Human Resources, to discuss his new position. Ms. Mulherin informed Mr. Axelrod that he would mentor the recruiters but that he would still not have direct supervision over them.

36. Mr. Axelrod was confused and disappointed by Ms. Mulherin's statement, including the fact that defendants were planning to continue paying him as "exempt" while telling him that he would essentially be only a lead employee.

37. A few days later, on February 1, 2022, defendants' Executive Vice President of Sales & Marketing, Gavin Polizzo, called Mr. Axelrod into a meeting in the Bridgeport office. Ms. Mulherin attended the meeting by teleconference. The office has a large glass window, so that more than one member of defendants' staff saw and heard what was occurring. Ms. Mulherin informed Mr. Axelrod that his employment was terminated.

38. Mr. Axelrod asked why he was being terminated. Ms. Mulherin said he had violated the code of ethics but refused to provide any further information. Mr. Polizzo said he did not know why the company was terminating Mr. Axelrod's employment..

39. Mr. Polizzo helped Mr. Axelrod pack up his belongings and, when it became clear that not everything would fit in the car, he told Mr. Axelrod he could return the following morning to retrieve the rest.

40. Mr. Axelrod returned to the PosiGen office the next morning after calling to check with Mr. Polizzo. His former co-workers said they had been told by PosiGen that Mr. Axelrod's employment was terminated because he had stolen company property.

41. Mr. Axelrod had brought with him items of PosiGen equipment that were still in his possession. But Mr. Polizzo refused to allow Mr. Axelrod to retrieve his belongings, saying that PosiGen believed the property belonged to the company.

42.     Among the items defendants refused to allow Mr. Axelrod to retrieve was a special orthopedic knee brace. As defendants were well aware, Mr. Axelrod was scheduled for knee surgery the following Monday, February 7. Defendants knew about this surgery because it resulted from a workplace injury and had been processed through, and approved by, PosiGen's workers compensation carrier. Defendants knew further that the orthopedic knee brace had been ordered for Mr. Axelrod's pre-operative care, as well as his post-operative care. In other words, defendants were intentionally depriving Mr. Axelrod of orthopedic equipment they knew he needed immediately, which had been ordered and approved by their own agent.

43.     It was not until February 8, after Mr. Axelrod's surgery, and after he had contacted the workers compensation carrier about this issue, that defendants informed him that "your knee brace was located" and offered to return it to him.

44.     Defendants' statement on February 8, 2022 that the "knee brace was located" was a false and pretextual implication that, before that date, they did not know where the knee brace was. In fact, they knew the location of Mr. Axelrod's belongings, which were in defendants' own possession and control.

45.     Another item of personal property that defendants refused to return to Mr. Axelrod is an ergonomic office chair that he had purchased privately.

46.     Defendants have not returned many items of Mr. Axelrod's personal property, including a 55-inch "smart" TV, a floor lamp and second chair, an air purifier, and artworks. The possessions defendants have not returned (despite requests to do so) include items that, as defendants have known, were used therapeutically by Mr. Axelrod for his personal health.

47.     Defendants failed and refused to give Mr. Axelrod any explanation for the termination of his employment until February 7, 2022, six days later, when he received an email

from Ms. Mulherin stating that he was "terminated for making untruthful statements to company leadership regarding your advancement path. We found that your statements were made to advance your personal financial interests and were misleading." In addition, Ms. Mulherin wrote that "you were terminated for your untruthful statement to company leadership regarding the status of a vendor account that involved a member of company leadership that refused to approve your purchase attempt that was in violation of the company's purchasing and reimbursement policies. Your untruthful statement was seen as an act of retaliation towards someone that was upholding company policy. Again, we found your statements to leadership was misleading, and your purchases to be exploiting your position with the company."

48.   The stated reasons for termination were false.

**COUNT ONE -- FAILURE TO PAY OVERTIME UNDER THE FLSA**

1-48.  Mr. Axelrod incorporates paragraphs 1-48 above.

49.   Defendants did not pay Mr. Axelrod at the rate of one and one-half times his regular hourly rate for hours worked in excess of 40 in a week, in violation of the FLSA, 29 U.S.C. § 207.

50.   Defendants' failure to pay Mr. Axelrod overtime wages as required by federal law was willful because they were aware of or reasonably should have been aware of their obligation to pay him in accordance with the FLSA but failed or refused to do so.

**COUNT TWO -- FAILURE TO PAY OVERTIME UNDER CONNECTICUT LAW**

1-50.  Mr. Axelrod incorporates paragraphs 1-50 above.

51.   Defendants did not pay Mr. Axelrod at the rate of one and one-half times his regular hourly rate for hours worked in excess of 40 hours in a week, in violation of Connecticut overtime laws, including Conn. Gen. Stat. §§ 31-68, 31-76b and 31-76c.

52.     Defendants' failure to pay Mr. Axelrod overtime wages as required by Connecticut law was willful, arbitrary, and/or in bad faith, because defendants were aware of or reasonably should have been aware of their obligation to pay him in accordance with Connecticut law but failed or refused to do so.

**COUNT THREE – FAILURE TO PAY WAGES UNDER CONNECTICUT LAW**

1-52.   Mr. Axelrod incorporates paragraphs 1-52 above.

53.     Defendants have failed to pay plaintiff all of the wages he was owed, including bonuses or commissions, as required by Conn. Gen. Stat. §§ 31-71a through 31-71e.

54.     Defendants' failure to pay Mr. Axelrod wages as required by Connecticut law was willful, arbitrary, and/or in bad faith, because defendants were aware of or reasonably should have been aware of their obligation to pay him in accordance with Connecticut law but failed or refused to do so.

**COUNT FOUR – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1-54.   Mr. Axelrod incorporates paragraphs 1-54 above.

55.     Defendants terminated Mr. Axelrod in a manner that was unreasonable, outrageous, and egregious.

56.     Defendants' conduct in the process of terminating Mr. Axelrod's employment created an unreasonable risk of causing him emotional distress.

57.     Mr. Axelrod's distress was foreseeable.

58.     Mr. Axelrod's emotional distress was severe enough that it might result in illness or bodily harm.

59.     Defendants' conduct was the cause of Mr. Axelrod's distress.

## COUNT FIVE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1-59.  Mr. Axelrod incorporates paragraphs 1-59 above.

60.  In terminating Mr. Axelrod in the manner above, defendants intended to inflict emotional distress upon Mr. Axelrod, or they knew or should have known that emotional distress was the likely result of their conduct.

61.  Defendants' conduct was extreme and outrageous.

62.  Defendants' conduct was the cause of Mr. Axelrod's distress.

63.  The emotional distress sustained by Mr. Axelrod was severe.

## COUNT SIX – DEFAMATION (PER SE)

1-63.  Mr. Axelrod incorporates paragraphs 1-63 above.

64.  Defendants published a defamatory statement about Mr. Axelrod when they informed members of PosiGen staff that he had been terminated for stealing company property.

65.  Defendants' defamatory statement identified plaintiff to third persons.

66.  Defendants' defamatory statement was published to third persons.

67.  Mr. Axelrod's reputation suffered injury as a result of defendants' statement.

## COUNT SEVEN – CONVERSION

1-67.  Mr. Axelrod incorporates paragraphs 1-67 above.

68.  By their actions above, defendants deprived Mr. Axelrod of his property permanently or for an indefinite time.

69.  In doing so, defendants, without authorization, assumed and exercised the ownership powers that belong to Mr. Axelrod.

70.  Defendants did so in a manner adverse to Mr. Axelrod.

71.  Defendants did so in a manner inconsistent with Mr. Axelrod's right of dominion.

72.  By their actions, defendants caused Mr. Axelrod harm.

## **COUNT EIGHT – CIVIL THEFT**

1-72.	Mr. Axelrod incorporates paragraphs 1-72 above.

73.	Defendants took, obtained, and/or withheld the property of Mr. Axelrod.

74.	Defendants did so with the intent to deprive Mr. Axelrod of his property, and to appropriate that property to themselves.

75.	Defendants have therefore violated section 52-564 of the Connecticut General Statutes.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff requests that this Court:

1. Order the defendants to pay to plaintiff all wages owed to him pursuant to 29 U.S.C. § 207 and Conn. Gen. Stat. §§ 31-68 and 31-72;

2. Award plaintiff an amount equal to all overtime wages owed as liquidated damages pursuant to 29 U.S.C. § 216(b);

3. Award plaintiff an amount equal to all wages owed as double damages pursuant to Conn. Gen. Stat. §§ 31-68 and 31-72;

4. Award plaintiff compensatory damages;

5. Award plaintiff punitive damages;

6. Award plaintiff his reasonable attorney's fees and costs pursuant to 29 U.S.C. § 216(b) and/or Conn. Gen. Stat. §§ 31-68 and 31-72, and Conn. Gen .Stat. § 52-564;

7. Award plaintiff treble damages for theft, pursuant to Conn. Gen .Stat. § 52-564;

8. Award plaintiff prejudgment and post-judgment interest; and

9. Award plaintiff other legal and equitable relief that the Court deems appropriate.

DAVID AXELROD,
PLAINTIFF

By: _____/s/_____
Andrew A. Cohen, ct07124
Winnick Ruben Hoffnung Peabody & Mendel, LLC
110 Whitney Avenue
New Haven, CT 06510
Phone: (203)772-4400x309
Fax: (203)772-2763
E-mail: andrew.cohen@winnicklaw.com